IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

SHANE MARCUM,

        Plaintiff,

v.                                      Case No. 2:20-cv-00394

BETSY JIVIDEN, et al.,

        Defendants.

**PROPOSED FINDINGS AND RECOMMENDATIONS**

Pending before the Court are Plaintiff's *pro se* complaint under 42 U.S.C. § 1983, (ECF No. 2), and Defendants' Motion to Dismiss, (ECF No. 16). This matter is assigned to the Honorable Irene C. Berger, United States District Judge, and is referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, the undersigned respectfully **PROPOSES** that the presiding District Judge accept and adopt the findings herein and **RECOMMENDS** that Defendants' Motion to Dismiss, (ECF No. 16), be **GRANTED**; that the complaint, (ECF No. 2), be **DISMISSED**, with prejudice; and that the action be **CLOSED** and **REMOVED** from the docket of the Court.

I.    **Relevant Facts and Procedural History**

    *A. Complaint*

On June 10, 2020, Plaintiff Shane Marcum filed a complaint pursuant to § 1983 against Betsy Jividen, Commissioner of the West Virginia Division of Corrections and

1

Rehabilitation; Donnie Ames, Superintendent of Mt. Olive Correctional Complex ("MOCC"); and John Frame, Warden of Security at MOCC. (ECF No. 2 at 4). Plaintiff claimed that, for approximately the past 28 months, Defendants ignored his requests and complaints regarding his right to have "like access" to a religious leader of his faith, religious material, religious land, and a 12-day feast. (*Id.*). He elaborated that he was only given one feast and was being forced to practice his religion in a Christian chapel at MOCC, which "completely contaminate[d] [his] religion land practice." (*Id.* at 5). Plaintiff further asserted that he was "being forced to support the Christian religion by forcefully being required to take the Christian based Quality of Life Program ["QOL"] for (18) months." (*Id.*). He sought $150,000.00 in damages, injunctive relief, and reimbursement of his court costs and filing fee. (*Id.* at 5-6). Plaintiff attached to his complaint numerous West Virginia Division of Corrections documents, including policies and procedures relating to religion, (ECF No. 2-1 at 7-35), as well as the following materials:

1. **Religious Assistance Fact Sheet**

In an undated Religious Assistance Fact Sheet, Plaintiff stated that he was a member of the Asatru faith, and he provided certain details concerning his faith. (ECF No. 2-1 at 3).

2. **Religious Special Diet Request and Authorization Form**

On July 18, 2018, Plaintiff filed a Religious Special Diet Request and Authorization Form, stating that he was a member of the Asatru faith. He affirmed that he did not require a special diet, but he must observe the 12-day Yule feast to honor the "ancestors – Gods & Goddesses." (*Id.* at 4). A chaplain responded that the form was approved, but only one feast would be offered, which was the Yule Feast. (*Id.*).

### 3. Inmate Religious Accommodation Request Form

On the same date, July 18, 2018, Plaintiff filed an Inmate Religious Accommodation Request Form, again stating that he was a member of the Asatru faith. Plaintiff explained that he wished to wear an amulet of his respective Gods or Goddesses and observe the eight ceremonial festivals/holy days each year, including the 12-day feast to honor the Gods and Goddesses. (*Id.* at 6). The chaplain's response stated that the form was approved, but only one feast, the Yule feast, would be provided. (*Id.*).

### 4. April 19, 2020 Grievance

On April 19, 2020, Plaintiff filed a grievance, stating that his religious rights were being grossly violated at MOCC. (ECF No. 2-1 at 1). He requested access to a religious leader, religious material, religious land, and 12-day feast. (*Id.* at 2). He also alleged that he was being forced to support Christianity through the QOL program packets. (*Id.*). The responding staff member stated that no visitors were allowed in the facility at that time due to the COVID-19 pandemic, but Plaintiff could exercise his religion in other ways, including by himself or in small groups. (*Id.* at 1). In addition, the responding staff member advised Plaintiff that his request would be revisited after the pandemic. (*Id.*).

### B. *Motion to Dismiss*

Defendants filed a motion to dismiss Plaintiff's complaint. (ECF No. 16). In the accompanying memorandum of law, Defendants asserted that their actions in denying Plaintiff the right to meet with a religious leader were constitutionally justified because accommodating Plaintiff would impose unjustified burdens on other institutionalized persons and would jeopardize the effective functioning of MOCC during a global pandemic. (ECF No. 17 at 6). Defendants argued that MOCC, along with all other buildings in the State of West Virginia, disallowed visitors to alleviate the potential risk of

spreading the virus. (*Id.*). Furthermore, Defendants noted that, contrary to Plaintiff's assertion that his claims predated the pandemic, the only known grievance regarding the issue was filed on April 19, 2020 during the COVID-19 quarantine period. (*Id.*). Regarding Plaintiff's claim that he was denied access to religious material and a 12-day feast, Defendants pointed out that "there is no documentation of any kind" regarding these claims before Plaintiff's April 19, 2020 grievance. (*Id.* at 7). They stated that, in the absence of such evidence, Plaintiff cannot contend that Defendants violated his rights. (*Id.*). Finally, Defendants argued that Plaintiff had no constitutional right to access religious lands while incarcerated, and such accommodation would be considered excessive and would jeopardize the effective functioning of the institution because MOCC would have to accommodate similar requests from other inmates, which would "exhaust all monetary funds and staffing availability to travel far distances." (*Id.*). Defendants asserted that they are entitled to qualified immunity on all of Plaintiff's claims as it is clear that they did not violate any clearly established law. (*Id.* at 8).

In response to Defendants' motion to dismiss, Plaintiff stated that he has been a member and practitioner of the "Odinist/Asatru faith" since July 24, 2018. (ECF No. 19 at 1). Furthermore, he attached the following documents:

### 1. August 8, 2019 Unit Team Request Form

On August 8, 2019, Plaintiff completed a Unit Team Request Form, stating that he was forced to participate in a Christian religion because the facility played a Christian worship service on the television, and the QOL program and substance abuse programs contained Christian prayers and material. (ECF No. 19 at 12). Plaintiff expressed that his right to practice his religion was being suppressed and MOCC was promoting Christian religions. (*Id.*). He wished for all religions to be represented or for all religious content to

4

be eliminated from the MOCC programming. (*Id.*).

### 2. August 25, 2019 Unit Request Form

On August 25, 2019, Plaintiff submitted another Unit Request Form, asking MOCC to reissue him a completion for the substance abuse class without the "Christian Prayer" on it because he was an Odinist and it contravened his beliefs. (*Id.* at 13). The unit staff member responded that the Serenity Prayer was not inconsistent with the Odinist religion, as it applied to all religions that endorse "a power greater than ourselves." (*Id.*).

### 3. August 26, 2019 Unit Request Form

In his August 26, 2019 Unit Request Form, Plaintiff asked, "why only one high feast of Odinist is honored" while other religions "get so much more," such as Muslims receiving "full Ramadan" and Christians receiving "full Christmas celebrations" and "weekly observances." (*Id.* at 15). MOCC's chaplain, Mark Hess ("Hess"), responded to the grievance and referred Plaintiff to Policy Directive 511.00, which he attached to his response. (*Id.*). Policy Directive 511.00 specified that declared members of a specific faith group may request *one* special meal observance per year, such as a feast following a Ramadan fast. (*Id.* at 17).

### 4. October 6, 2019 Unit Request Forms

On October 6, 2019, Plaintiff submitted a Unit Request Form, requesting a list of study guides, literature, or books concerning the Odinist/Asatru faith that were available for him to obtain. (*Id.* at 19). Hess responded that there were copies of pamphlets that Plaintiff could request. (*Id.*). Plaintiff also asked for a list of all banned books, magazines, or other literature concerning the Odinist/Asatru faith to which Hess responded that there were no banned books. (*Id.* at 21). Hess stated that there were no available books regarding that faith, but there was a "little material that we will send." (*Id.*).

5

## II.     Standard of Review

A motion under Rule 12(b)(6) tests the sufficiency of the complaint. *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570 (2007) (stating to survive a 12(b)(6) motion, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face"). The Court also considers any exhibits attached to the complaint and documents explicitly incorporated by reference. Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016) (stating that the Court's review is generally limited to a review of the allegations of the complaint itself, but the Court also considers documents that are explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits).

In resolving a motion to dismiss, the Court must assume that the facts alleged in the complaint are true and will draw all reasonable inferences in Plaintiff's favor as the nonmoving party. *Burbach Broad. Co. of Delaware v. Elkins Radio Corp.*, 278 F.3d 401, 405-06 (4th Cir. 2002). The purpose of Rule 12(b)(6) "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). "Furthermore, when as here, a Rule 12(b)(6) motion is testing the sufficiency of a civil rights complaint, 'we must be especially solicitous of the wrongs alleged' and 'must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief *under any legal theory which might plausibly be suggested by the facts alleged.*'" *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999) (quoting *Harrison v. United States Postal Serv.*, 840 F.2d 1149, 1152 (4th Cir. 1988)).

While the Court "take[s] the facts in the light most favorable to the plaintiff, … [the

6

Court] need not accept the legal conclusions drawn from the facts," and "need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (quoting *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000)). A complaint fails to state a claim when, accepting the plaintiff's well-pleaded allegations as true and drawing all reasonable inferences, the complaint lacks "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A pleading that "offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do" and a complaint will not "suffice if it tenders naked assertions devoid of further factual enhancements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citations omitted).

Court are required to liberally construe *pro se* complaints. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007). However, even under this less stringent standard, the complaint still must contain sufficient factual allegations to support a valid legal cause of action. *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). The Court may not rewrite the pleading to include claims that were never presented, *Parker v. Champion*, 148 F.3d 1219, 1222 (10th Cir. 1998), construct the plaintiff's legal arguments for him, *Small v. Endicott,* 998 F.2d 411, 417-18 (7th Cir. 1993), or "conjure up questions never squarely presented" to the Court. *Beaudett v. City of Hampton,* 775 F.2d 1274, 1278 (4th Cir. 1985).

## III. Discussion

Plaintiff alleges that Defendants ignored his requests and complaints seeking access to a religious leader, religious material, religious land, and a 12-day feast. (ECF No. 2 at 4). He also asserts that he was forced to support the Christian faith through the QOL program. (*Id.* at 5). Plaintiff's claims implicate several constitutional and federal laws.

The Free Exercise Clause of the First Amendment to the United States Constitution guarantees inmates the right to free exercise of religion while incarcerated, *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987), and prohibits customs or policies that are designed to suppress religious beliefs and practices. *Morrison v. Garraghty*, 239 F.3d 648, 656 (4th Cir. 2001). In addition, the Religious Land Use and Institutionalized Persons Act (RLUIPA) provides that no government shall impose a substantial burden on the religious exercise of an inmate unless the government demonstrates that the burden promotes a compelling governmental interest and is the least restrictive means of furthering that interest.

To succeed on a claim of religious discrimination under either of these provisions, an inmate must make an initial showing that he sincerely holds a religious belief and that action by the defendants substantially burdens his religious freedom or expression. "In essence, the plaintiff's claims under the Free Exercise clause and the RLUIPA impose the same requirements: the plaintiff must allege facts showing that a particular action by a particular defendant 'substantially burdened his sincerely-held religious beliefs.'" *Blakely v. Wards*, 2011 WL 2559601, at *11 (D.S.C. May 20, 2011) (quoting *Ajaj v. Federal Bureau of Prisons*, 2011 WL 902440 (D. Colo. 2011)); *see also Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Cutter v. Wilkinson*, 544 U.S. 709 (2005).

The Supreme Court has defined "substantial burden" as "substantial pressure on an adherent to modify his behavior and to violate his beliefs," *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981), or an action that compels a person to "choose between following the precepts of [his] religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of [his] religion … on the other hand," *Sherbert v. Verner*, 374 U.S. 398, 404 (1963). "No substantial burden occurs

8

if the government action merely makes the 'religious exercise more expensive or difficult' or inconvenient, but does not pressure the adherent to violate her religious beliefs or abandon one of the precepts of her religion." *Rountree v. Clarke*, No. 7:11CV00572, 2015 WL 1021286, at *7 (W.D. Va. Mar. 9, 2015) (quoting *Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007)). "[A]t a minimum the substantial burden test requires that a RLUIPA plaintiff demonstrate that the government's denial of a particular religious … observance was more than an inconvenience to one's religious practice." *Baines v. Hicks*, No. 3:14CV616, 2016 WL 7380558, at *10 (E.D. Va. Dec. 20, 2016) (quoting *Smith*, 502 F.3d at 1278); *Sullivan v. Younce*, No. 3:15CV10, 2017 WL 655175, at *9 (E.D. Va. Feb. 16, 2017) (holding that removal of purported religious materials from inmate's cell was an inconvenience, not a substantial burden on his exercise of religion).

Once a plaintiff satisfies the requirement to demonstrate that the challenged practice substantially encumbers his exercise of religion, the burden of persuasion shifts to the government to demonstrate that the practice is the least restrictive means to further a compelling governmental interest. *Estes v. Clarke*, No. 7:15CV00155, 2018 WL 2709327, at *5 (W.D. Va. June 5, 2018) (citing 42 U.S.C. § 2000cc-2(b)). According to the *Estes* Court, "[t]he least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party." *Id.* (quoting *Jehovah v. Clarke*, 798 F.3d 169, 177 (4th Cir. 2015)). Moreover, "[i]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Id.* (quoting *Holt v. Hobbs*, 135 S. Ct. 853, 864 (2015)). When considering whether a prison's practice is overly burdensome, "[c]ourts must give 'due deference to the experience and expertise of prison and jail administrators in establishing necessary

regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Id.* (quoting *Cutter*, 544 U.S. at 723).

In addition to the above, the Equal Protection Clause generally requires the government to treat similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439 (1985). In order to show that his equal protection rights were violated, a plaintiff must demonstrate that he was treated differently than similarly situated inmates and the discrimination was intentional or purposeful. *Winder v. Maynard*, 2 F. Supp. 3d 709, 716 (D. Md.), *aff'd,* 583 F. App'x 286 (4th Cir. 2014) (citation omitted). "If the discrimination was based on a plaintiff's membership in a suspect class, the differential treatment must be narrowly tailored to a compelling interest; otherwise, the plaintiff must show that the discrimination did not bear a rational relationship to a legitimate government purpose." *Id.* (citing *Cleburne,* 473 U.S. at 440–42). With the above principles in mind, the undersigned considers Plaintiff's specific claims.

### A. *Religious Leader*

Plaintiff first asserts that Defendants ignored his requests and complaints to have access to a religious leader of his faith. (ECF No. 2 at 4). Defendants respond that the religious accommodation would impose unjustified burdens on other institutionalized persons and jeopardize the effective functioning of MOCC because no visitors are allowed into the facility during the COVID-19 pandemic. (ECF No. 17 at 5-6). They explain that Plaintiff's request will be revisited once the restriction is lifted.

Plaintiff attached to his complaint a copy of MOCC's operating procedure relating to religious services and programs, which documents that MOCC allows religious representatives to enter the facility to minister to inmates in certain circumstances. (ECF No. 2-1 at 18). Plaintiff also attached a copy of grievance which he submitted on April 19,

2020 in the midst of the COVID-19 pandemic. He requested "access to a religious leader." (ECF No. 2-1 at 2). MOCC staff responded to Plaintiff the following day, explaining that no one was permitted to enter the facility due to COVID-19 restrictions, even "religious people to perform religious courses." (*Id.* at 1). Plaintiff was informed that he could practice his religion by himself or with a limited number of other people during the restriction, and his request would be reconsidered once the pandemic ended. (*Id.*).

Finally, Plaintiff attached to his complaint a copy of West Virginia Division of Corrections Fact Sheet that he completed. He listed that he was a member of the Asatru religion. (*Id.* at 3). He wrote he was not initiated by anyone because it was not necessary in his religion and there was no need to maintain active contact with such person. (*Id.*). He listed that his present minister, religious advisor, or spirit guide was an individual located in Arizona, but the person was not on his approved visitors list, and he did not maintain active contact with individual. (*Id.*).

As an initial matter, Plaintiff fails to assert any facts showing that Defendants substantially burdened his religious freedom or expression. As previously stated, Plaintiff practices Asatru, "a polytheistic religion" that originated in Northern Europe. *Krieger v. Brown*, 496 F. App'x 322, 323 (4th Cir. 2012). "Asatru is a decentralized religion, which does not have a spiritual leader or governing religious authority." *Id.* Instead, "[p]ractitioners of Asatru adhere to general principles of the religion, but each member or group of members exercise their faith in a personal manner." *Id.* While Plaintiff submitted numerous materials in support of his claim, none of them indicate that access to a religious leader, especially in-person contact, is a precept of Plaintiff's religion. To the contrary, the materials that he submitted support the opposite conclusion. For example, in his Religious Assistance Fact Sheet, Plaintiff stated that he did not have his religious

11

leader on his approved visitors list and did not maintain active contact with him. Furthermore, Plaintiff does not assert that he was prevented from accessing a religious leader in other ways, such as through the telephone, mail, or other means.

Moreover, if the denial of this religious accommodation placed a substantial burden on Plaintiff's religious freedom or expression, Defendants have unequivocally established a compelling government interest in restricting visitors at this time. According to the documents submitted by Plaintiff, MOCC implemented a strict no visitor policy due to the unprecedented health crisis. Plaintiff does not assert that he was singled out by Defendants regarding this policy, nor does he assert that he requested access to a religious leader outside of the pandemic. (ECF Nos. 2, 2-1).

For the above reasons, the undersigned **FINDS** that Plaintiff fails to assert a viable claim under § 1983 concerning lack of access to a religious leader. *See, e.g., McGlothlin v. Murray*, 993 F. Supp. 389, 411 (W.D. Va. 1997), *aff'd,* 151 F.3d 1029 (4th Cir. 1998) ("The preponderance of the evidence is that all volunteers, religious and nonreligious, are subjected to the same security assessment […] Most important, however, is the fact that the denials complained of in this case invariably were the product of the prospective volunteer's criminal record, a standard that applied equally to all who sought entry into the facility. Moreover, the lack of Muslim volunteers did not restrict or substantially burden plaintiff's ability to exercise his religion. Although plaintiff testified that he desired to learn more about the faith from outside volunteers, there was no evidence that his ability to practice his religion was in any way hindered for lack of contact with volunteers.").

### B. *Religious Material*

Plaintiff further states that Defendants ignored his repeated requests for access to

12

religious material. (ECF No. 2 at 4). However, Plaintiff's complaint is most notable by what it does not allege. Plaintiff does not assert that he was denied his own religious materials or restricted from accessing materials that were otherwise available to him. Rather, according to the documents provided by Plaintiff, he asked MOCC's chaplain, Hess, whether there was any Odinist/Asatru literature that he could request and whether any such material was banned. (ECF No. 19 at 19, 21). Hess responded that there were no banned books, and there were only a few pamphlets, which he would send to Plaintiff. (*Id.*).

Therefore, Plaintiff's claim simply does not rise to the level of a constitutional violation, or offend RLUIPA. MOCC was under no obligation to procure additional religious materials for Plaintiff. *See, e.g., Lee v. Johnson*, 793 F. Supp. 2d 798, 802 (W.D. Va. 2011) ("Against this background, Lee's first claim is notable for what it does not allege. Lee does not complain that Chaplain Richardson restricted Lee's ability to use or access religious materials with which Lee would have supplied himself; he simply takes Chaplain Richardson to task for failing to affirmatively procure House of Yahweh materials for Lee upon Lee's request […] Unfortunately for Lee, '[t]here cannot possibly be any constitutional or legal requirement that the government provide materials for every religion and sect practiced in this diverse country. At most, [religious] materials cannot be denied to prisoners if someone offers to supply them.' In short, while Lee has a constitutional right to be free of certain state restrictions upon his religious activities, nothing in the Constitution compels the state to affirmatively aid him in his spiritual journey. Because the facts alleged by Lee with respect to this claim do not implicate any constitutional right, the claim must be dismissed.") (citations omitted). Therefore, the undersigned **FINDS** that Plaintiff does not assert a cognizable claim under § 1983

regarding lack of access to religious materials.

### C. Religious Feast

Plaintiff next argues that he was denied a 12-day feast, as required by his religion, whereas Ramadan participants "get a (30) day meal advantage and a feast at the end." (ECF No. 2 at 4). He attached to his complaint a copy of Policy Directive 511.00, which states that declared members of any faith group may request one special meal observance per year that is accepted as a common practice of that faith. (ECF No. 2-1 at 33). For example, an inmate may receive a feast following a Ramadan fast. (*Id.*).

Defendants assert that this claim should be dismissed because the denial of Plaintiff's 12-day feast was not a constitutional violation, as they had a compelling government interest in the safety of their inmates. (ECF No. 17 at 5). Another division of this Court made a similar finding in a previous case. In *Blake v. Rubenstein*, inmates at MOCC filed a claim under § 1983, alleging that the defendants' actions "without any compelling or legitimate penological interest placed a substantial burden on their practice of the Hare Krishna religion in violation" of their rights under the Constitution and RLUIPA. *Blake v. Rubenstein*, No. CV 2:08-0906, 2016 WL 5660355, at *1 (S.D.W. Va. Apr. 5, 2016), *report and recommendation adopted,* 2016 WL 5661233 (S.D.W. Va. Sept. 28, 2016). They argued that MOCC's policy of only allowing one special religious meal per year prevented them from participating in all of holy of days prescribed by their religion. The Court found that, even if the plaintiffs could demonstrate a substantial burden, the defendants demonstrated that the burden was the least restrictive means of furthering a compelling governmental interest because the defendants had a compelling interest in treating all religious groups equally, and they applied a one religious meal policy to all religious groups. *Id.* at *21. The Court explained that the uniform one-special meal policy

14

avoided the perception of favoritism and minimized the potential for inmate conflict. *Id*. The Court further noted that "allowing more than one religious meal a year would impose additional financial burdens and staffing burdens." *Id.*

Based on the above, Plaintiff fails to state a claim for relief under § 1983. Plaintiff refers to the Ramadan fast as a "meal advantage," but he did not allege that he was prevented from engaging in a similar fasting ritual. Construing his allegations in the light most favorable to him, the one-special meal policy is applied equally to all faith groups. Legal precedent supports a finding that Defendants have a compelling government interest in applying the one-special meal policy to inmates and that Plaintiff's rights have not been violated by receiving only one special religious meal per year. Therefore, the undersigned **FINDS** that Plaintiff fails to state a claim under § 1983 regarding the denial of a 12-day feast.

### D. Religious Land

Plaintiff further asserts that Defendants denied him access to religious land. (ECF No. 2 at 4, 5). This claim focuses on Plaintiff's allegation that he is "forced to practice [his] religion in the Christian Chapel" at MOCC, which he states, "completely contaminates [his] religious land practice." (*Id*. at 5). Defendants argue that Plaintiff has no constitutional right to religious land while incarcerated because it would impose great administrative and financial burdens to provide specific religious land to each faith group. (ECF No. 17 at 7). Indeed, the Supreme Court of the United States has explicitly stated that "[a] special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand." *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972). Rather, the Constitution demands only that "reasonable opportunities must be afforded to all prisoners to exercise

15

the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty." *Id.*

In *Krieger*, the United States Court of Appeals for the Fourth Circuit considered § 1983 claims asserted by an Asatru prisoner. In that case, the Fourth Circuit examined whether the denial of an outdoor worship circle substantially burdened the practice of the prisoner's religion. The Fourth Circuit held that the district court was correct in concluding that, despite "the significance of land to the Asatru religion," which was a religion "based on the laws of nature," the practice of Asatru was individualized and lacked any mandatory aspect of exercise. *Krieger*, 496 F. App'x at 325–26.

Similarly, in this case, Plaintiff fails to state a claim that worshipping in a certain area of MOCC, such as the chapel, substantially burdens the practice of his religion. Plaintiff also does not assert any factual allegations that Defendants have prevented him from practicing his faith in other areas of MOCC, including his cell. Furthermore, Defendants demonstrate a compelling government interest in not providing specific religious land for each faith group to practice within MOCC. Therefore, the undersigned **FINDS** that Plaintiff fails to state a claim under § 1983 regarding lack of access to religious land.

### E. QOL Program

Finally, Plaintiff asserts in his complaint that he was forced to support the Christian religion because he was required to take the "Christian based" QOL program for 18 months. (ECF No. 2 at 5). This bare statement fails to assert a claim under § 1983. Plaintiff does not offer facts or documents indicating that the QOL program endorses Christianity, or that his "forced" participation in the program violated his constitutional rights or rights under RLUIPA. Other inmates have asserted different claims regarding

the QOL program, and the Court has explained that the QOL program "at MOCC is a behavior-driven progressive incentive system consisting of five levels" in which "[i]nmates qualify for advancement to the next level by completing required behavioral and educational programs." *Marcum v. Rubenstein*, No. 2:13-CV-22424, 2016 WL 3355065, at *2 n.1 (S.D.W. Va. May 26, 2016), *report and recommendation adopted,* 2016 WL 3351181 (S.D.W. Va. June 15, 2016); *see also Douty v. Ballard,* 2015 WL 1246615, at *5 (S.D.W. Va. Mar. 18, 2015), *aff'd,* 613 F. App'x 223 (4th Cir. 2015) ("The QOL program requires inmates to complete certain educational packets"). In fact, another MOCC inmate has complained that his rights under RLUIPA were violated because he was specifically *prohibited* from providing religious responses in the QOL program. *Douty*, 2015 WL 1246615, at *5, *9. In any event, Plaintiff's threadbare recital does not present sufficient facts to state a claim of constitutional dimension. Therefore, the undersigned **FINDS** that Plaintiff does not state a claim upon which relief can be granted under § 1983 concerning the QOL program.

### IV. <u>Proposal and Recommendation</u>

For the reasons that follow, the undersigned respectfully **PROPOSES** that the presiding District Judge accept and adopt the findings herein and **RECOMMENDS** that Defendants' Motion to Dismiss, (ECF No. 16), be **GRANTED**; that the complaint, (ECF No. 2), be **DISMISSED**, with prejudice; and that the action be **CLOSED** and **REMOVED** from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure. The parties shall

have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Berger, and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to the Plaintiff, Defendants, counsel of record, and any unrepresented party.

**FILED:** November 4, 2020

Cheryl A. Eifert
United States Magistrate Judge